UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CORTEZ FOSTER and PAULA RODGERS, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:19-cv-843 |
| CITY OF BUFFALO POLICE OFFICER SHAWN MCCABE, CITY OF BUFFALO POLICE OFFICER PATRICK MCDONALD, CITY OF BUFFALO POLICE LIEUTENANT JONATHAN PIETRZAK, CITY OF BUFFALO POLICE HOMICIDE DETECTIVE JOY JERMAIN, NEW YORK STATE PAROLE OFFICER JOSE MELENDEZ, NEW YORK STATE PAROLE OFFICER SEAN MCPARTLAND, NEW YORK STATE PAROLE OFFICER THOMAS DEGOL,[1] | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**SUPPLEMENTAL ORDER ON MOTION FOR PARTIAL DISMISSAL**
**(Doc. 3)**

Cortez Foster and his mother Paula Rodgers sue the above-captioned municipal police officers and state parole officers in their individual capacities under 42 U.S.C. § 1983 and other provisions of federal and state law. Plaintiffs allege that their home was subjected to an illegal search by or at the behest of Defendants on January 29, 2018, and that Mr. Foster was subjected to unlawful arrest, malicious prosecution, wrongful imprisonment, and racial discrimination.

---

[1] Per the advice of Defendants (Doc. 3-1 at 2 n.1), the Clerk is respectfully directed to amend the caption to revise the spelling of "Thomas DeGol" to "Thomas DeGal."

(Doc. 1.) Defendants Thomas DeGal and Sean McPartland (the "State Defendants")[2] have filed a Motion for Partial Dismissal under Fed. R. Civ. P. 12(b)(6) seeking dismissal of all claims against them except for the § 1983 false arrest and malicious prosecution claims and the conspiracy claim under 42 U.S.C. § 1985. (Doc. 3-1.) In an Order dated November 26, 2019, the court granted that motion in part, but reserved ruling on the motion to dismiss Plaintiffs' § 1983 unlawful-search claims pending additional briefing on qualified immunity. The State Defendants filed a timely supplemental brief on January 9, 2020. (Doc. 15.) Plaintiffs have not filed a supplemental response.

## Background

Plaintiffs allege the following. Plaintiff Paula Rodgers resides in the upper unit of a Deerfield Avenue property in Buffalo, New York. (Doc. 1 ¶ 2.) She resided there during the events relevant to the Complaint. Plaintiff Cortez Foster is Ms. Rodgers's son. (*See id.* ¶ 19.) Mr. Foster currently resides elsewhere in Buffalo but he resided at the Deerfield Avenue property's upper unit during the events referenced in the Complaint. (*Id.* ¶ 3.)

Mr. Foster was released on parole on March 6, 2017. (*Id.* ¶ 19.) He is a black male with "numerous tattoos and distinguishing characteristics." (*Id.* ¶ 27.) He was assigned to the supervision of New York State parole, and upon his release to parole he was living with his mother at her parole-approved address at the upper unit of the Deerfield Avenue property. (*Id.* ¶ 19.)

There was a "shooting incident" at the Checkmate Bar on East Lovejoy Street in Buffalo on January 27, 2018. (*Id.* ¶ 20.) Neither Plaintiff was at the Checkmate Bar on that date. (*Id.*)

---

[2] The Complaint names three New York state parole officers as defendants, but the Motion for Partial Dismissal is brought by only two of those three officers. For present purposes, the court refers to Officers DeGal and McPartland as the "State Defendants."

2

Mr. Foster had not gone to the Checkmate Bar at any time since he was released on parole. (*Id.* ¶ 36.) He was at home abiding by his curfew on January 27, 2018. (*Id.*)

At some point between January 27 and January 29, 2018, a number of New York State parole officers and Buffalo police detectives reviewed a video of the Checkmate Bar incident "to see if they could positively identify any of the individuals involved with this incident." (*Id.* ¶ 21.) Parole officer Sean McPartland was one of the individuals who reviewed the video. (*Id.* ¶ 22.) He later testified that the video "depicted a chaotic scene with numerous individuals moving about, and the video was of a low quality." (*Id.* ¶ 26.) At the time he reviewed the video Officer McPartland was Mr. Foster's newly-assigned parole officer. (*Id.* ¶ 23.) He had not yet met Mr. Foster. (*Id.*)

Buffalo police detective Joy Jermain and state parole officer Thomas DeGal also reviewed the video. (*Id.* ¶ 22.) Officer DeGal was Officer McPartland's superior. (*Id.* ¶ 95.) Detective Jermain "identified" one of the individuals in the video as Mr. Foster. (*Id.* ¶ 93.)[3] Plaintiffs allege upon information and belief that Detective Jermain was the officer who "first suggested" to Officer DeGal that Mr. Foster was depicted in the video. (*Id.* ¶ 95.) Upon reviewing the video, Officer McPartland "came to believe 'it was possible that the person in the video was Cortez Foster.'" (*Id.* ¶¶ 24, 94.)[4]

---

[3] Plaintiffs assert that Detective Jermain's purported identification of Mr. Foster as one of the individuals in the video was "capricious[] and without good cause." (*Id.* ¶ 93.)

[4] The quotation regarding what Officer McPartland allegedly came to believe comes from a transcript—attached as an exhibit to the Complaint—of an October 11, 2018 hearing before Buffalo City Court Judge Amy C. Martoche. (Doc. 1-1.) At that hearing Judge Martoche found that Officer McPartland "looked at the video and he said, and I quote, it was possible that the person in the video was Cortez Foster." (*Id.* at 2–3.)

3

Plaintiffs allege that Detective Jermain directed parole officers DeGal and McPartland to raid and search Plaintiffs' house. (*Id.* ¶ 25.) At approximately 10:00 p.m. on January 29, 2018, Buffalo police lieutenant Jonathan Pietrzak and officers Shawn McCabe and Patrick McDonald, together with parole officers Jose Melendez and Mr. McPartland, searched and seized Plaintiffs and their residence at the upper unit of the Deerfield Avenue property. (*Id.* ¶ 29.) The search was conducted without a warrant and over Plaintiffs' objections. (*See id.* ¶¶ 30, 49.) During the search both Plaintiffs were ordered to sit at the kitchen table for four hours; Mr. Foster was handcuffed. (*Id.* ¶ 45.)

In the course of the search, Officer Melendez recovered a Norinco AK-47 firearm in the heating duct of the basement of the Deerfield Avenue property. (*Id.* ¶ 32.) Officer McPartland recovered ammunition and a revolver from the basement heating duct. (*Id.* ¶ 34.) The basement is a common area shared by both the upper and lower units of the residence. (*Id.* ¶ 32.) Mr. Foster never makes use of the basement area. (*Id.*) Neither Plaintiff ever possessed the firearms or the ammunition that were recovered during the search. (*Id.* ¶ 35.)

Mr. Foster was arrested and taken into custody on January 29, 2018. (*Id.* ¶ 37.) He was arraigned in Buffalo City Court on January 30, 2018 on multiple state felony and misdemeanor firearms charges. (Doc. 1-2.) The Buffalo City Court held a suppression hearing and heard testimony from Officer McPartland and from several members of Mr. Foster's family. (Doc. 1-1 at 2.) Mr. Foster's conditions of parole and the video of the Checkmate Bar shooting incident were not introduced at the suppression hearing. (*Id.* at 3.) Officer McPartland did not specify how the individual depicted in the video resembled Mr. Foster, apart from saying that the individual in question was a "medium sized black male." (*Id.* ¶ 27.)

4

The Buffalo City Court suppressed the evidence and dismissed the charges on October 11, 2018. The court reasoned that "a parolee's status cannot be exploited to allow for a search which is solely designed to collect contraband or aid in an independent criminal investigation" and that "failure to provide the conditions of parole and the failure to provide the video" prevented the court from analyzing whether the warrantless search was rationally and reasonably related to the parole officer's duties. (*See* Doc. 1-1 at 3–4.) Mr. Foster was incarcerated from January 29, 2018 until "several days" after the dismissal of the charges against him on October 11, 2018. (Doc. 1 ¶ 40.)

## Analysis

Of the eight causes of action in the Complaint, only two are potentially at issue here.[5] The first is Plaintiffs' first cause of action, brought by both Plaintiffs, alleging a § 1983 claim for unlawful entry into their home in violation of the Fourth Amendment. (Doc. 1 ¶¶ 42–58.)[6] The court reserved ruling on such unlawful-search claims pending additional briefing on qualified immunity. (Doc. 12 at 10.) The second is the sixth cause of action brought by Mr. Foster alleging racial profiling and discrimination in violation of 42 U.S.C. § 1981. In its November 26, 2019 Order, the court dismissed that claim insofar as it purports to be a § 1981

---

[5] The State Defendants did not seek dismissal of the second, fourth, or seventh causes of action (a § 1983 malicious-prosecution claim, a § 1983 false-arrest claim, and a § 1985 conspiracy claim, respectively). Plaintiffs conceded that their state-law claims for malicious prosecution, false arrest and imprisonment, and intentional infliction of emotional distress (the third, fifth, and eighth causes of action, respectively) should be dismissed in favor of action in a different jurisdiction, and the court has dismissed those claims without prejudice. (Doc. 12 at 9.)

[6] The first cause of action also refers to the Fourteenth Amendment, although in this context that appears to be a reference to the fact that the Fourth Amendment is enforceable against the states through the Fourteenth Amendment. *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 528 (1967).

5

claim, but without prejudice to a motion to amend to assert the racial discrimination claim under § 1983. (Doc. 12 at 9.)

## I. Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). The court must also draw all reasonable inferences in the non-moving party's favor. *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

## II. Alleged Unlawful Entry and Search

### A. Fourth Amendment Principles

"The Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *United States v. Barner*, 666 F.3d 79, 82 (2d Cir. 2012) (quoting *United States v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004)). Although warrantless searches are "generally presumed unreasonable," a state's operation of a parole system "presents special needs justifying a departure from the traditional Fourth Amendment warrant requirement." *Newton*, 369 F.3d at 665. New York operates a parole system under which a parolee must "permit his parole officer to visit him at his residence and/or place of employment" and must "permit the search and inspection of his person, residence and property." N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.2(d).

6

Notwithstanding that consent, under New York law, "the determination as to whether a warrantless parole search 'was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.'" *Barner*, 666 F.3d at 84 (quoting *People v. Huntley*, 371 N.E.2d 794, 797 (N.Y. 1977)). Prior to the Supreme Court's 2006 decision in *Samson v. California*, 547 U.S. 843, the Second Circuit had held this New York rule (or "*Huntley* standard") to be coextensive with the requirements of the Fourth Amendment. *See Barner*, 666 F.3d at 84 (citing *United States v. Grimes*, 225 F.3d 254, 259 n.4 (2d Cir. 2000) (per curiam)).

But in *Samson*, the Supreme Court held that the Fourth Amendment was not violated by a police officer's suspicionless search of a parolee conducted under the authority of a California law under which every parolee "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." *Samson*, 547 U.S. at 846 (quoting Cal. Penal Code Ann. § 3067(a)). The *Samson* Court rejected an argument that the California parole search law permitted untethered discretion to officers, reasoning that the California law prohibited "arbitrary, capricious or harassing" searches. *Id.* at 856. The concluding paragraph of the *Samson* opinion states: "[W]e conclude that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 857.

The Second Circuit has since observed that "the law is unclear whether the *Huntley* standard has been superseded by *Samson*." *Black v. Petitinato*, 761 F. App'x 18, 21 (2d Cir. 2019) (summary order). Indeed, the Second Circuit has noted "that it is an open question whether *Samson* may justify a parole officer's suspicionless search of a New York parolee's

7

home." *Id.* Because of that open question, the court in *Black* affirmed the grant of summary judgment to the defendants based on qualified immunity. *Id.* at 20.

### B.  Qualified Immunity

In their August 9, 2019 motion to dismiss, the State Defendants sought dismissal of Plaintiffs' first cause of action on the basis that the warrantless search was proper under the *Huntley* standard. (*See* Doc. 3-1 at 6.) They did not explicitly invoke or mention qualified immunity. Noting that the issue of qualified immunity should be decided early, if possible, the court invited briefing on that issue. (Doc. 12 at 8.) The State Defendants have filed a supplemental memorandum asserting that they are entitled to qualified immunity on Plaintiffs' Fourth Amendment unlawful-search claim. (Doc. 15 at 3.) The issue of qualified immunity is therefore now squarely before the court.

#### 1.  The Qualified Immunity Doctrine

The qualified-immunity doctrine shields state officials from civil liability for damages if their "conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) (alteration in original; quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity "shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019) (alteration in original; quoting *Ricciuti v. Gyzenis*, 834 F.3d

8

162, 167 (2d Cir. 2016)). The court has discretion to decide which prong to address first. *See id.* at 140.

When the qualified immunity defense is analyzed at the motion-to-dismiss stage, the applicable standard is "more stringent." *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). The court must "accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, including both those that support the claim and 'those that defeat the immunity defense.'" *Id.* (quoting *McKenna*, 386 F.3d at 436).

### 2. No Clearly Established Law Prohibited the Search

The court elects to begin with the second ("clearly established") prong of the qualified-immunity analysis. While the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Francis*, 942 F.3d at 145 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). Such precedent "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

The Supreme Court has instructed courts "not to define clearly established law at a high level of generality," *id.* (quoting *City & Cty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775–76 (2015)), and has instead emphasized that "clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *White*, 137 S. Ct. at 552). Thus the court must exercise "particular caution before rejecting an officer's claim to qualified immunity in the Fourth Amendment context, in which 'it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'"

9

*Shakir v. Stankye*, No. 18-242-cv, 2020 WL 1480141, at *2 (2d Cir. Mar. 24, 2020) (summary order) (quoting *Mullenix*, 136 S. Ct. at 308). Indeed, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

As the Second Circuit has stated, "the law is unclear whether the *Huntley* standard has been superseded by *Samson*." *Black*, 761 F. App'x at 21. Focusing on the particularized factual allegations in this case, the court concludes that, as in *Black*, there was no clearly settled law telling the State Defendants that their search of the upper unit of the Deerfield Avenue property and the common basement area violated the standards of the Fourth Amendment. Since Mr. Foster was a parolee and the law is unsettled as to whether *Samson* superseded the *Huntley* standard, no clearly established law told the officers that they could not search the residence.

Even accepting as true that the video on which Detective Jermain relied to make her purported identification depicted a chaotic scene and was of low quality, that does not constitute a basis for the State Defendants to disbelieve the purported identification. The State Defendants could reasonably rely on Detective Jermain's identification. *See Lauderdale v. City of New York*, No. 15-cv-1486 (JGK), 2018 WL 1413066, at *5 (S.D.N.Y. Mar. 19, 2018) (officer was entitled to qualified immunity on false arrest claim because it was objectively reasonable for her to rely on fellow officer's identification); *see also Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 127–28 (2d Cir. 2009) (summary order) (police officers making probable cause determinations are entitled to rely on their fellow officers' allegations). Moreover, the unsettled state of the law meant that the State Defendants could not have known whether it was unlawful to proceed even with a suspicionless search. *See Reed v. Sheppard*, 321 F. Supp. 3d

429, 448 (W.D.N.Y. 2018) ("[F]ollowing the Supreme Court's 2006 decision in *Samson, supra,* it is not clearly established that some particularized suspicion is required before searching a parolee or his residence.").

### 3. "Stalking Horse" Theory

In their Complaint, Plaintiffs argue that "New York State Parole act[ed] as a conduit for the Buffalo Police Department to engage in a fishing expedition." (Doc. 1 ¶ 47.) That argument—premised on the involvement of police officers in allegedly directing parole officers DeGal and McPartland to raid and search Plaintiffs' house and in participating in the search—is essentially an invocation of the "stalking horse" theory. The theory "disapproves of a parole officer's acting as a stalking horse for law enforcement officers by searching a parolee not in the performance of the P.O.'s own duties but solely in response to a prior request by, and in concert with, law enforcement officers." *United States v. Lambus*, 897 F.3d 368, 387 (2d Cir. 2018). Although the stalking horse theory has been adopted in some Circuits, the Second Circuit has rejected it. *Id.* (citing *Newton*, 369 F.3d at 666–67, and *United States v. Reyes*, 283 F.3d 446, 462–65 (2d Cir. 2002)). The police officers' involvement therefore does not alter the qualified immunity analysis.

### 4. Ms. Rodgers's Claim; Whether Her Consent Was Necessary

The State Defendants further assert that since parole officers had a right to enter the home that Mr. Foster shared with his mother, Ms. Rodgers cannot prevail on her Fourth Amendment claim against them, either. (*See* Doc. 3-1 at 7.) Plaintiffs fault the State Defendants for failing to cite any authority to support that proposition, and further maintain that even if the State Defendants prevailed on their motion against Mr. Foster's claims, a jury could still find the actions against Ms. Rodgers to be unlawful. (Doc. 10 at 4.) The State Defendants reply that "[i]t

11

would seem axiomatic that a parolee could not shield himself from the mandate that he consent to searches of his residence by simply living with a non-parolee, who could object to the search of their joint residence." (Doc. 11 at 5.) The State Defendants further assert that the law on this subject is in flux following the Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103 (2006), suggesting that they would be entitled to qualified immunity as to Ms. Rodgers's Fourth Amendment claim as well.

The court agrees with the State Defendants that there was no clearly established law requiring Ms. Rodgers's consent before conducting the warrantless search of the residence she shared with her parolee-son, and that the State Defendants are accordingly entitled to qualified immunity on her § 1983 claim. In *Randolph*, the Supreme Court held that when police seek to conduct a consent search of a premises, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Randolph*, 547 U.S. at 106. *Randolph*, however, did not involve a parole search.

As this court has recently noted, "[t]he courts to have considered the import of *Randolph* in the context of individuals who co-habit or reside with a parolee or probationer have reached differing conclusions." *Reed*, 321 F. Supp. 3d at 450 (citing post-*Randolph* cases, including *Smith v. City of Santa Clara*, 876 F.3d 987, 994 (9th Cir. 2017)). Recognizing the law on this point as unsettled, the *Reed* court held that a parole officer and police officers were entitled to qualified immunity on § 1983 claims by the parolee's father and brother (all co-tenants) arising out of a warrantless search of a location the officers believed to be the parolee's residence, which was conducted over the objection of the parolee's brother who was physically present. *Id.* at 451. Here, even accepting the Complaint's factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the court concludes that the State Defendants are

entitled to qualified immunity on Ms. Rodgers's § 1983 claim for the same reasons. *See Frego v. Kelsick*, 690 F. App'x 706, 708–09 (2d Cir. 2017) (summary order) (affirming dismissal of parolee's wife's unreasonable-search claim on qualified-immunity grounds because parole officers reasonably concluded that they could inspect absconded parolee's home without a warrant and despite wife's presence and objection).

### 5.   Detentions During the Search

The court has also considered the allegations regarding Plaintiffs' treatment during the search.[7] According to the Complaint, the search lasted for four hours, during which time both Plaintiffs were required to sit at a table, and Mr. Foster was handcuffed. (Doc. 1 ¶ 45.) For the reasons below, the court concludes that because the State Defendants are entitled to qualified immunity as to the search, they are also entitled to qualified immunity—even drawing all reasonable inferences in Plaintiffs' favor—as to the detentions during the search.

"[O]fficers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). Three law enforcement interests justified the detention in *Summers*: preventing flight, minimizing risk of harm to officers, and the orderly completion of the search. *Summers*, 452 U.S. at 702–03. The Supreme Court also considered "the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant." *Id.* at 703. And "[i]nherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Meuhler*, 544 U.S. at 98–99. The

---

[7] The State Defendants' briefing does not explicitly address this issue, but the court addresses it here because even if the State Defendants are entitled to qualified immunity as to initiating the search, their conduct during the search must still be scrutinized.

13

*Meuhler* Court determined that the use of handcuffs to effectuate the detention in that case was reasonable "because the governmental interests outweigh the marginal intrusion." *Id.* at 99. Justice Kennedy added a concurrence "to help ensure that police handcuffing during searches becomes neither routine nor unduly prolonged." *Id.* at 102 (Kennedy, J., concurring).

Of course, *Summers* and *Muehler* concerned detention in the context of the execution of a search warrant, whereas in this case the search was performed at a parolee's residence without a warrant. But courts have considered the rationales in *Summers* and *Muehler* to evaluate the detention of occupants during warrantless searches. *See Frego*, 690 F. App'x at 709 ("[G]iven that Defendants were entitled to qualified immunity as to the [warrantless] search [of absconded parolee's residence], they were also, in the circumstances of this case, entitled to qualified immunity as to the force they used to effectuate it." (citing *Muehler*, 544 U.S. at 98–99)); *United States v. Williams*, No. 12-CR-6152G, 2015 WL 429087, at *18 (W.D.N.Y. Feb. 2, 2015) (warrantless search based on emergency aid doctrine), *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. May 29, 2015).

Here, similar to *Frego*, the State Defendants are entitled to qualified immunity as to the force they used to effectuate the parole search. Since the State Defendants are entitled to qualified immunity as to the search itself, they were also entitled to detain the occupants using "reasonable force" until the conclusion of the search. *Frego*, 690 F. App'x at 709. Even drawing all reasonable inferences in Plaintiffs' favor, the allegations in the Complaint do not support a conclusion that the force used to effectuate the search violated any clearly established statutory or constitutional right.

It is clearly established that the governmental interests must be weighed against the marginal additional intrusion of the detention during the search. *Muehler*, 544 U.S. at 99 (citing

*Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).  All of the law enforcement objectives listed in *Summers* apply here.  The officers had a legitimate interest "in preventing flight in the event that incriminating evidence is found."  *Summers*, 452 U.S. at 702.  Since the search was arguably related to a shooting incident, detention served to minimize the risk of harm to officers.  Moreover, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."  *Id.* at 702–03.  And the officers could reasonably conclude that the presence of both Plaintiffs could facilitate the orderly completion of the search.  *See id.* at 703 (noting that occupants' "self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand").

To be sure, the detention of both Plaintiffs was a "significant restraint" on their liberty.  *Summers*, 452 U.S. at 701.  But that restraint was less intrusive than the search itself.  *See id.* at 701–02 (noting that most citizens would elect to remain to observe the search of their possessions; that the likelihood of exploitation or unduly long searches is low because the information the officers seek in a search will be obtained through the search and not through the detention; and because detention in the occupant's home during a search adds minimally to stigma, inconvenience, and indignity compared to a compelled visit to a police station).

According to the Complaint, the search lasted four hours.  "The duration of a detention can, of course, affect the balance of interests under *Graham*."  *Muehler*, 544 U.S. at 100.  The four-hour search here is within the range of objective reasonableness, especially considering that the officers needed to search for weapons in both the upper unit and the common basement area.  *Cf. id.* (two-to-three-hour detention did not outweigh government's continuing safety interests); *see also Summers*, 452 U.S. at 711 n.3 (Stewart, J., dissenting) (record did not clearly reveal

15

length of the search, but noting FBI search of a one-bedroom apartment for burglar tools and a pair of checks consumed five hours).

Ms. Rodgers was not handcuffed during the detention, but Mr. Foster was and that "was undoubtedly a separate intrusion in addition to detention" at the kitchen table. *Muehler*, 544 U.S. at 99. The *Muehler* Court found no violation in the use of handcuffs to detain a female occupant in executing a warrant to search for weapons at the residence of a wanted gang member. *Id.* at 100. Here there was no warrant and none of the allegations suggest gang activity, but the officers were present in connection with an investigation into a shooting and were searching for weapons. They handcuffed only the male parolee. The safety risk inherent in searching for weapons, plus the need to detain two occupants, was "sufficient to justify the use of handcuffs." *Muehler*, 544 U.S. at 100.

## III. Racial Discrimination

The Complaint's sixth cause of action is a claim of racial discrimination in purported violation of 42 U.S.C. § 1981. As originally pleaded, Mr. Foster claimed that he was subjected to the torts of unlawful arrest and imprisonment and that those alleged wrongs were racially motivated in violation of the full and equal benefit of the laws under § 1981. (*See* Doc. 1 ¶¶ 88–102.) Mr. Foster alleges that the "identification" of him from the video of the incident at the Checkmate Bar and Defendants' subsequent warrantless search "present an inference that [such actions] were borne from a stereotype that African American individuals all look alike, and speak to the Defendants' beliefs that the freedom and liberty of a person of color is worth significantly less than the same of a white person." (*Id.* ¶ 100.)

The court noted in its November 26, 2019 Order that Mr. Foster had recognized that the appropriate statute to bring the racial discrimination claim against state actors is 42 U.S.C.

16

§ 1983. (*See* Doc. 12 at 9.)[8] The court accordingly dismissed the sixth cause of action insofar as it purports to be a § 1981 claim, but without prejudice to a motion to amend to assert the racial discrimination claim under § 1983. The court simultaneously invited the parties to brief the impact of qualified immunity on any amended racial discrimination claim under § 1983. (*Id.*)

The State Defendants assert that they are entitled to qualified immunity on Mr. Foster's Fourteenth Amendment racial discrimination claim. (Doc. 15 at 7.) Mr. Foster does not appear to dispute that his sixth cause of action—recast as a § 1983 claim—would be a claim that state actors violated his rights under the Equal Protection Clause of the Fourteenth Amendment. The court accordingly considers the State Defendants' qualified immunity defense as to that claim against them.

### A.     Equal Protection Principles

"To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000); *see also Jennings v. Decker*, 359 F. Supp. 3d 196, 205 n.12 (N.D.N.Y. 2019) ("Constitutional claims alleging racial profiling are subject to the analysis of the Fourteenth Amendment Equal Protection Clause." (quoting *Marshall v. Town of Middlefield*, No. 3:10-CV-1009 (JCH), 2012 WL 601783, at *6 (D. Conn. Feb. 23, 2012)). A plaintiff can plead intentional discrimination in violation of the Equal Protection Clause in several ways, including "by pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully

---

[8] *See Duplan v. City of New York*, 888 F.3d 612, 619–20 (2d Cir. 2018) (reaffirming ongoing vitality of the Supreme Court's holding in *Jett v. Dallas Independent School District*, 491 U.S. 701, 733 (1989), that "the express cause of action for damages created by § 1983 constitutes the *exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental units").

17

discriminatory manner, or a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (per curiam) (quoting *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001)).

## B. Qualified Immunity

Focusing on the "clearly established" prong, the State Defendants concede that the right not to be subject to racial discrimination is clearly established. (Doc. 15 at 8.) Indeed, "[i]f law enforcement . . . takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *Brown*, 221 F.3d at 338 (quoting *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997)). But the State Defendants maintain that the clearly established law must not be defined at a high level of generality, and that they are entitled to qualified immunity because "there is no clearly established law which prevents a parole officer from relying on the identification of one of his parolees by a fellow officer, even if that identification may be tinged by racial animosity or ignorance." (Doc. 15 at 9–10.) The State Defendants also assert that "there are no facts pled to indicate that they were aware of such animosity or ignorance." (*Id.* at 10.)

Here, as the court concluded above—even accepting as true that the video on which Detective Jermain relied to make her purported identification depicted a chaotic scene and was of low quality—that does not constitute a basis for the State Defendants to disbelieve the purported identification. If Detective Jermain's purported identification was based on racial animosity or prejudice, the allegations fall short of plausibly pleading that the State Defendants could have known of it or that their role in the search was based solely on race.

18

## Conclusion

Defendants Thomas DeGal and Sean McPartland's Motion for Partial Dismissal (Doc. 3) is GRANTED insofar as it seeks dismissal of the first and sixth causes of action against those defendants.

Dated this 29th day of May, 2020.

/s/ Geoffrey W. Crawford
U.S. District Court Judge