UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CORTEZ FOSTER and PAULA RODGERS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:19-cv-843 |
| CITY OF BUFFALO POLICE OFFICER SHAWN MCCABE, CITY OF BUFFALO POLICE OFFICER PATRICK MCDONALD, CITY OF BUFFALO POLICE LIEUTENANT JONATHAN PIETRZAK, CITY OF BUFFALO POLICE HOMICIDE DETECTIVE JOY JERMAIN, NEW YORK STATE PAROLE OFFICER JOSE MELENDEZ, NEW YORK STATE PAROLE OFFICER SEAN MCPARTLAND, NEW YORK STATE PAROLE OFFICER THOMAS DEGAL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**
**(Docs. 29, 33)**

Cortez Foster and his mother Paula Rodgers sue the above-captioned municipal police officers and state parole officers in their individual capacities under 42 U.S.C. § 1983 and other provisions of federal and state law. Plaintiffs allege that their home was subjected to an illegal search by or at the behest of Defendants on January 29, 2018, and that Mr. Foster was subjected to unlawful arrest, malicious prosecution, wrongful imprisonment, and racial discrimination. (Doc. 1.) City of Buffalo officers Shawn McCabe, Patrick McDonald, Jonathan Pietrzak, and Joy Jermain (the "City Defendants") have answered and asserted crossclaims for indemnification against the co-defendant New York State parole officers. (*See* Doc. 4 ¶¶ 142–143.)

In a pair of orders on a motion for partial dismissal brought by Thomas DeGal and Sean McPartland, the court dismissed Mr. Foster's state-law claims (the third, fifth, and eighth counts) and further dismissed Plaintiffs' § 1983 unlawful-search claims and Mr. Foster's racial discrimination claim (the first and sixth counts) as against those defendants. (Docs. 12, 16.) Two motions for summary judgment are currently pending. The City Defendants seek summary judgment on all claims against them. (Doc. 29.) New York State parole officers Thomas DeGal and Sean McPartland (the "State Defendants") likewise seek summary judgment on all of Plaintiffs' claims against them and further seek summary judgment on any crossclaims against them. (Doc. 33.) The court heard argument on the motions on February 6, 2024.

## Background

Although there are two separate motions for summary judgment, the court has compiled this single statement of facts for use with both motions. The following facts are undisputed except where noted.

At all relevant times, plaintiffs Paula Rodgers and her son Cortez Foster resided in the upper unit of a Deerfield Avenue property in Buffalo, New York. Mr. Foster was released on parole on March 6, 2017. He was assigned to the supervision of New York State parole, and upon his release to parole he was living with his mother at her parole-approved address in the upper unit of the Deerfield Avenue property. The general conditions of release included Mr. Foster's agreement to "permit my parole officer to visit me at my residence and/or place of employment" and to "permit the search and inspection of my person, residence and property." (*See* Doc. 33-2 at 19; Doc. 33-3 at 10); *see also* N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.2 (2017) (release conditions). The special conditions of parole included a prohibition on

possession of guns or ammunition.  (Doc. 29-1 ¶¶ 6–7); *see also* N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.3 (2017) (special conditions).

New York State Department of Corrections and Community Supervision Directive 9404 ("Search and Seizure") was in effect at the relevant times in this case.  That directive included the following written procedures for searches:

 a. A premises is defined as the parolee's living/sleeping quarters or living/sleeping area.

 b. Parolee: A PO [Parole Officer] may search, or direct the search of premises under a parolee's control . . . when there is an articulable reason for the search and when the search is rationally and reasonably related to the performance of the PO's duties.  Prior to conducting such a search, in the absence of exigent circumstances or consent, the PO must confer with a [Senior Parole Officer, Bureau Chief, or Regional Director] and obtain supervisory approval for such search.

 c. Third Party: Absent a search warrant, a PO may not search any other premises, including those of a third party, which are not under a parolee's control without the consent of the person in possession, ownership, or control of the premises.

(Doc. 33-4 at 9.)[1]

There was a shooting incident at the Checkmate Bar on East Lovejoy Street in Buffalo on January 27, 2018.[2]  On January 28, 2018, the Erie Crime Analysis Center called New York State Parole Buffalo Bureau Chief Thomas DeGal and asked him to view a video of the incident. (Doc. 33-4 ¶¶ 2, 6; Doc. 33-3 ¶ 10; *see also* Doc. 34 (video recording).)  Chief DeGal asked

---

[1] The copy of Directive 9404 that appears in the record is dated August 7, 2018 and supersedes a prior version dated May 25, 2017.  The court presumes that the relevant provisions quoted above are the same as or substantially similar to the provisions in effect at the times relevant in this case.

[2] In their response to the City Defendants' statement of facts, Plaintiffs state that they "lack[] sufficient information to confirm or deny such a claim."  (Doc. 36-1 ¶ 4.)  However, in their response to the State Defendants' statement of facts, Plaintiffs "agree and admit" to this statement.  (Doc. 40-1 ¶ 17.)  The court concludes that this fact is undisputed, particularly because Plaintiffs allege these facts in their complaint.  (Doc. 1 ¶ 20.)

other parole officers to accompany him "to determine if anyone at my office could identify the shooting suspects." (Doc. 33-4 ¶ 9.)  Parole Officer Sean McPartland was one of the officers who accompanied Chief DeGal and viewed the video.  (*Id.* ¶ 9; *see also* Doc. 33-3 ¶ 10.)  Officer McPartland had recently been assigned to Mr. Foster and had not yet met him personally. (Doc. 33-3 ¶ 15.)  Chief DeGal was not aware of a parolee named Cortez Foster until the events after viewing the video.  (Doc. 33-4 ¶ 6.)

The parole officers viewed the video together with Buffalo police officers, including Detective Joy Jermain.  (*See* Doc. 33-4 ¶ 10; Doc. 33-3 ¶ 11.)  At some point during the viewing, one of the Buffalo police officers—Detective Jermain, according to Officer McPartland's declaration—said that one of the people in the video could be "Tez"—i.e., Cortez Foster. (Doc. 33-3 ¶ 14; Doc. 33-4 ¶ 10.)  At the time they watched the video, Chief DeGal did not recognize anyone on the recording, and Officer McPartland did not recognize the person of interest.  (Doc. 33-3 ¶ 12; Doc. 33-4 ¶ 7.)  At that time, however, Officer McPartland believed that "it was possible that the person in the video was Cortez Foster."  (Doc. 36-4 at 2–3; *see also* Doc. 29 ¶ 6, Doc. 36-1 ¶ 6, Doc. 33-1 ¶ 19, Doc. 40-1 ¶ 19.)

Mr. Foster viewed the video at his deposition on June 30, 2023.  He testified that the video shows African American people but that nobody in the video looks like him and that he did not recognize anyone in the video.  (Doc. 37 at 63–64.)  At the February 26, 2024 motion hearing, counsel for the City Defendants agreed that, with the benefit of hindsight, Mr. Foster was not involved in the shooting incident.  There appears to be no dispute on that point.

After viewing the video with the other officers, Chief DeGal authorized a search of Mr. Foster's residence for "compliance with his conditions of release."  (Doc. 33-4 ¶ 11; *see also* Doc. 33-3 ¶ 16.)  The officers did not obtain a warrant before the search.  Multiple parole and

police officers—including Chief DeGal and Officer McPartland—went to Mr. Foster's Deerfield Avenue residence on the evening of January 29, 2018. (*See* Doc. 33-3 ¶¶ 20–22; Doc. 33-4 ¶ 19; Doc. 37 at 30.) Mr. Foster's niece opened the door and Officer McPartland entered the residence. (*See* Doc. 33-3 ¶¶ 21, 24; Doc. 33-4 ¶ 19.)[3]

Mr. Foster testified that officers "put me in handcuffs and they sat me, my mother and my niece down at the dining room table and then they just started searching." (Doc. 40-3 at 33.) Chief DeGal states that, before the search, he entered the residence and requested and obtained Ms. Rodgers's permission to search the residence. (*See* Doc. 33-4 ¶ 21; *see also* Doc. 33-3 ¶ 28.) Plaintiffs attempt to dispute that assertion by citing Mr. Foster's testimony that his mother asked the officers "[i]f they had an arrest warrant, a search warrant" and that the officers said that they did not need a warrant and then ignored her. (Doc. 37 at 36; Doc. 40-1 ¶ 41.) The court concludes that Plaintiffs have not cited any affirmative evidence to dispute Chief DeGal's testimony that he requested and obtained Ms. Rodgers's permission to search the residence.[4]

It is undisputed that the officers carried out a search of the Deerfield Avenue unit and that officers noted that there was a basement at the property. (*See* Doc. 33-4 ¶ 25.) Chief DeGal states that he asked Ms. Rodgers for permission to search the basement and that she consented. (*Id.*) Plaintiffs attempt to dispute that assertion by citing Mr. Foster's testimony about his

---

[3] Officer McPartland states that he knocked and announced himself. (Doc. 33-3 ¶ 21.) Plaintiffs assert that they "dispute that anyone knocked . . . about 15 Officers entered without permission." (Doc. 40-1 ¶ 35.) The court agrees that Mr. Foster testified that the officers entered the residence "without permission." (Doc. 37 at 30.) Plaintiffs cite no affirmative evidence to refute Officer McPartland's testimony that he knocked. Any dispute on this point is ultimately not material to the court's analysis.

[4] The allegation in the complaint that the officers proceeded "without the consent of Plaintiffs or any other authorized individuals" (Doc. 1 ¶ 49) is not evidence. *See, e.g., Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023) ("[A]n unverified complaint is not evidence that can be relied upon at summary judgment.").

mother's questions about a warrant. (Doc. 37 at 36; Doc. 40-1 ¶ 41.) As above, the court concludes that Plaintiffs have not cited any affirmative evidence to dispute Chief DeGal's testimony that he requested and obtained Ms. Rodgers's permission to search the basement. It is undisputed that officers discovered guns and ammunition in the heating duct of the basement at the property. (*See* Doc. 29 ¶ 6; Doc. 36-1 ¶ 6; Doc. 33-3 ¶¶ 34–37; Doc. 33-3 at 15–19.) A resident of the first-floor unit at the Deerfield Avenue property stated that she did not store anything in the basement and had never seen the gun; she further stated that the landlord did not store any belongings there. (Doc. 33-3 at 13.)

It is undisputed that, after the discovery of the guns and ammunition in the basement, Mr. Foster was arrested and charged with multiple state felony and misdemeanor firearms charges. (*See* Doc. 29 ¶ 7; Doc. 36-1 ¶ 7; *see also* Doc. 29-3.) Those charges were dismissed after a suppression hearing in Buffalo City Court on October 11, 2018. (*See* Doc. 36-4.) That court reasoned in pertinent part as follows:

> The video was never provided for me to review from Officer McPartland. His bureau chief directed him to search the residence, to, quote, make sure that he was in compliance with his parole. The parole conditions were never provided to the Court, in fact, they weren't even testified to. Parole officers arrived to search and there is some confusion as to who actually arrived at what point, Officer McPartland said that he arrived with parole officers and then called BPD after the gun was located. . . .
>
> So, it is clear under the law that a parolee has a right to be free from unreasonable search and seizures. But a search is not violative of a parolee's rights if it is rational and reasonably related to a parole officer's duties and in supervising. So, really that's the question and we know under the circumstances under the law that a parole officer can't merely be a conduit for doing what police officers otherwise cannot do, that's also clear. Stated another way, a parolee's status cannot be exploited to allow for a search which is solely designed to collect contraband or aid in an independent criminal investigation. Additionally, where an arrest or search is made without a search warrant, the reviewing court must be supplied with the description of the person which the police acted and sufficient evidence to make its own independent determination of whether the person arrested or the item seized reasonably fits the description. In other words, I should have been presented with the video . . . . Simply put, based on this record, the failure to provide the

conditions of parole and the failure to provide the video is fatal, I am suppressing the evidence.

(Doc. 36-4 at 3–4.)  Plaintiffs filed their complaint in this federal case on June 24, 2019. (Doc. 1).

## Legal Standard

"Summary judgment is warranted only upon a showing that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a).  "In deciding whether such a showing has been made we 'resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought.'"  *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  "The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)).  But "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Souza v. Exotic Island Enters, Inc.*, 68 F.4th 99, 108 (2d Cir. 2023) (alteration in original) (quoting *CILP Assocs., L.P. v. Price Waterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013)).  Where, as here, a defendant seeks summary judgment based on the qualified immunity defense, "the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Vasquez v. Maloney*, 990 F.3d 232, 238 n.5 (2d Cir. 2021) (quoting *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000)).

7

## Analysis

The City and State Defendants seek summary judgment on all claims against them. (Docs. 29, 33.) The State Defendants also seek summary judgment on any crossclaims against them. (Doc. 33-5 at 8.) The court applies the summary judgment standard to each of the remaining claims, starting with the claims brought under federal law.

### I.      Federal Claims

Plaintiffs' federal claims are brought under 42 U.S.C. § 1983 and related statutes. Section 1983 provides a private cause of action for individuals to sue a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Section 1983 does not itself create or establish a federally protected right; instead, it creates a cause of action to enforce federal rights created elsewhere, such as a federal constitutional right. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

In Count 1, both plaintiffs allege that officers unlawfully entered and searched their home without a warrant in violation of Plaintiffs' Fourth Amendment rights. Mr. Foster also alleges malicious prosecution (Count 2) and unreasonable seizure, false arrest, and false imprisonment (Count 4) in violation of his Fourth Amendment rights. Mr. Foster's remaining federal claims are for conspiracy under 42 U.S.C. § 1985 (Count 7) and for racial discrimination (Count 6). The court considers each of these claims below.

A.    **Section 1983 Claims for Unlawful Entry and Search (Count 1)**

The court previously dismissed Count 1 as against State Defendants Chief DeGal and Officer McPartland.  (Doc. 16.)  The court therefore analyzes Count 1 only as against the City Defendants.

The City Defendants argue that they are entitled to qualified immunity on Plaintiffs' illegal-search claims.  (Doc. 29 at 7.)  Analyzing that defense on summary judgment,[5] the court considers: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).  A right is "clearly established" when "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful."  *Wiggins v. Griffin*, 86 F.4th 987, 994 (2d Cir. 2023) (per curiam) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).

The court begins with the "clearly established" prong.  At a general level, it is clearly established that "[t]he Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of

_____

[5] The court recognizes that the doctrine of qualified immunity has recently been the subject of intense public scrutiny and debate, especially as the doctrine relates to police conduct. Courts have also weighed in on the issue. *See, e.g.*, *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., statement respecting denial of certiorari) ("[O]ur qualified immunity jurisprudence stands on shaky ground."); *McKinney v. City of Middletown*, 49 F.4th 730, 756 (2d Cir. 2022) (Calabresi, J., dissenting) ("[T]he doctrine of qualified immunity—misbegotten and misguided—should go."); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 391–92 (S.D. Miss. 2020) (asserting that qualified immunity "operates like absolute immunity" in real life, and that the doctrine "has served as a shield" for law enforcement officers who have failed to respect "the dignity and worth of black lives").  Still, "[t]his Court is required to apply the law as stated by the Supreme Court."  *Jamison*, 476 F. Supp. 3d at 392.

privacy." *United States v. Barner*, 666 F.3d 79, 82 (2d Cir. 2012) (quoting *United States v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004)).  But defining the right at that "high level of generality" does not advance the analysis; the court must focus "on the specific factual situation the officers confronted."  *McKinney v. City of Middletown*, 49 F.4th 730, 739 (2d Cir. 2022) (cleaned up).

This case involves the warrantless search of a New York parolee at a residence that he shared with his mother.  Although warrantless searches are "generally presumed unreasonable," a state's operation of a parole system "presents special needs justifying a departure from the traditional Fourth Amendment warrant requirement."  *Newton*, 369 F.3d at 665.  New York operates a parole system under which a parolee must "permit his parole officer to visit him at his residence and/or place of employment" and must "permit the search and inspection of his person, residence and property."  N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.2(d).

The Second Circuit has recognized that, as applied to a New York parolee, the Fourth Amendment's prohibition on unreasonable searches and seizures is evaluated under one of two standards: the "*Huntley*" standard (named for *People v. Huntley*, 371 N.E.2d 794, 797 (N.Y. 1977)) or the standard articulated in *Samson v. California*, 547 U.S. 843 (2006).  "[T]he law is unclear whether the *Huntley* standard has been superseded by *Samson*."  *Black v. Petitinato*, 761 F. App'x 18, 21 (2d Cir. 2019) (summary order); *see also United States v. Melvin*, No. 20-CR-61, 2023 WL 6456788, at *5 n.5 (W.D.N.Y. Oct. 4, 2023) (noting that "[t]he Second Circuit has grappled with the reach and application of *Samson*"—which involved a police officer's suspicionless search of a parolee's person, not his residence—and that "it is unclear whether *Samson* applies to cases involving New York parolees").

If the *Huntley* standard applies, then the court analyzes "whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.'" *Barner*, 666 F.3d at 84 (quoting *People v. Huntley*, 371 N.E.2d 794, 797 (N.Y. 1977)). If *Samson* has superseded the *Huntley* standard, then the "reasonableness" analysis would presumably not focus on the relationship of the parole search to parole duties. Instead, analogizing *Samson*, law enforcement could conduct a search of a parolee's residence without limitation—except for searches that New York prohibits as "so divorced from reasonable suspicion as to be arbitrary and capricious." *United States v. Quinones*, 457 F. App'x 68, 70 (2d Cir. 2012) (summary order); *see also Samson*, 547 U.S. at 856 (authorizing suspicionless search of California parolee would not give officers "unbridled discretion" because California law prohibits "arbitrary, capricious or harassing" searches).

No reasonable law enforcement officer could be expected to determine whether *Samson* supersedes the *Huntley* standard for parole searches. But all reasonable law enforcement officers should understand that, at minimum, existing law prohibits parole searches that are "arbitrary, capricious or harassing." That is the only "clearly established" right relevant to the unlawful-search claim.

### 1.    Mr. Foster's Claim

Here, the evidence in the light most favorable to Mr. Foster does not support a claim that the City Defendants violated the right against arbitrary, capricious, or harassing parole searches. There is evidence that, as parole and police officers viewed the video together on January 28, 2018, Detective Jermain said that one of the people in the video could be "Tez"—i.e., Cortez Foster. The parties disagree as to whether the video supports that remark; counsel for the City

Defendants asserts that there is a resemblance, whereas Plaintiffs urge the court to "draw its[] own conclusions."  (Doc. 40-1 ¶ 26.)

The court concludes that, at worst, Detective Jermain's statement was mistaken.  It is undisputed that she uttered the statement in the presence of parole officers, but the court finds no evidence that she made the statement in bad faith or that it was arbitrary or otherwise improper.[6] The court's review of the video is not to the contrary.  Although it is now undisputed that Mr. Foster did not appear in the video, the court finds no evidence that Detective Jermain's remark was anything more than a "mistake in the performance of an official duty"; such a mistake does not deprive her of qualified immunity.  *Rupp v. Buffalo*, 91 F.4th 623, 642 (2d Cir. 2024).

Notably, Chief DeGal and Officer McPartland's testimony about what Detective Jermain said would presumably not be introduced in this case for its truth (i.e., that one of the people in the video could be "Tez").  *See* Fed. R. Evid. 801(c) (defining hearsay).  The statement would instead be offered for its effect on the officers that heard it, including Chief DeGal.  Chief DeGal states that he authorized the search "based upon this information" and on his "training and many years of experience."  (Doc. 33-4 ¶ 11.)  Relevant to Mr. Foster's claim against the City Defendants, Plaintiffs have supplied no evidence contrary to Chief DeGal's testimony that he, "solely and through my authority," authorized the search in this case.  (*Id.*)  Thus, even if there was evidence that the City Defendants engaged in any wrongful conduct before the search, there is no evidence that any of the City Defendants authorized or even requested the search.[7]

---

[6] [Absent evidence of an attempt to influence parole officers to take action for some improper reason, it would probably be error for courts to impose liability on officers who make similar remarks.  As I learned at "Trivia Night" with Ray Sun, "popcorning" or bouncing ideas around in a group is a very effective way for the group to solve a problem.  Sometimes even "wrong" ideas jumpstart other people's memories or imaginations.]

[7] The allegation in the complaint that Detective Jermain "directed Defendants [DeGal] and McPartland to initiate a raid" (Doc. 1 ¶ 25) is not evidence.  *See, e.g., Caro Cap., LLC v.*

After Chief DeGal authorized the search, no reasonable defendant would have thought that existing law prohibited the City Defendants from accompanying the parole officers and assisting with a parole search.   *See United States v. Lambus*, 897 F.3d 368, 387 (2d Cir. 2018) (noting that the Second Circuit has rejected the so-called "stalking horse" theory); *United States v. Reyes*, 283 F.3d 446, 464 (2d Cir. 2002) (law enforcement agencies can lawfully engage in a "coordinated effort" with probation officers if "the probation officers are pursuing legitimate probation-related objectives").   As noted above, the court has already dismissed the unlawful-search claims against the State Defendants, including Chief DeGal.  (*See* Doc. 16.)  No evidence provides any basis for a claim that the State Defendants were pursuing anything other than legitimate probation-related objectives.  The court therefore concludes that the City Defendants are entitled to summary judgment on Mr. Foster's claims in Count 1.

### 2.    Ms. Rodgers's Claim

Similarly, as to Ms. Rodgers's claim, no reasonable defendant would have understood from the existing law that it might be unlawful for the City Defendants to accompany the parole officers and search Ms. Rodgers's residence.  Here, the evidence is that—consistent with Department of Corrections and Community Supervision Directive 9404—Chief DeGal requested Ms. Rodgers's consent to the search of the upstairs unit and the shared basement space. Plaintiffs have failed to produce any evidence sufficient to dispute Chief DeGal's statements that Ms. Rodgers gave her consent.

Even if Plaintiffs could raise a dispute about whether Ms. Rodgers gave her consent, the City Defendants would still be entitled to qualified immunity.  The court previously ruled that

---

*Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023) ("[A]n unverified complaint is not evidence that can be relied upon at summary judgment.").

13

the State Defendants were entitled to qualified immunity on Ms. Rodgers's § 1983 claim.

(Doc. 16 at 11–13.)  The court recognized the Supreme Court's holding in *Georgia v. Randolph*

that when police seek to conduct a consent search of a premises, "a physically present co-

occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable

and invalid as to him."  *Randolph*, 547 U.S. 103, 106 (2006).  But *Randolph* did not involve a

parole search and "[t]he courts to have considered the import of *Randolph* in the context of

individuals who co-habit or reside with a parolee or probationer have reached differing

conclusions."  *See Reed v. Sheppard*, 321 F. Supp. 3d 429, 450 (W.D.N.Y. 2018) (citing post-

*Randolph* cases, including *Frego v. Kelsick*, 690 F. App'x 706, 708–09 (2d Cir. 2017) (summary

order), and *Smith v. City of Santa Clara*, 876 F.3d 987, 994 (9th Cir. 2017)).  Because it is not

clear whether the rule from *Randolph* applies in a parole search like this one, the City

Defendants are also entitled to qualified immunity on Ms. Rodgers's § 1983 claim.

**B.**   **Section 1983 Claim for Unreasonable Seizure, False Arrest, and False Imprisonment (Count 4)**

Count 4 is Mr. Foster's § 1983 claim against all defendants for unreasonable seizure,

false arrest, and false imprisonment.[8]  The State Defendants seek summary judgment on Count 4,

arguing that Mr. Foster has failed to make a sufficient showing on two of the essential elements

of the claim: that Mr. Foster did not consent to the confinement and that the confinement was not

otherwise privileged.  (Doc. 33-5 at 10.)  All defendants argue that they are entitled to qualified

immunity on Count 4.  (Doc. 29 at 10; Doc. 33-5 at 16, 21.)

---

[8] Whether described as "unreasonable seizure," "false arrest," or "false imprisonment," the claim in Count 4 is a single theory; there is no material difference in the essential elements or the available defenses.  *See McGuire v. Town of Cheektowaga*, No. 20-cv-01632, 2024 WL 385212, at *8 (W.D.N.Y. Jan. 31, 2024) (noting that a § 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures" and that "false arrest is considered to be a species of false imprisonment" (citations omitted)).

"Probable cause to arrest is a complete defense to a false arrest claim." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021); *see also, e.g.*, *Thompson v. Kline*, 504 F. Supp. 3d 200, 208 (W.D.N.Y. 2020) (same). "In general, probable cause to arrest exists when 'the historical facts, viewed from the standpoint of an objectively reasonable police officer,' . . . provide knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Rupp*, 91 F.4th at 638 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "[Q]ualified immunity is available where officers of reasonable competence could disagree on whether the probable cause test was met, *i.e.*, where the existence of probable cause for an arrest was at least reasonable and arguable, even if mistaken." *Id.* at 642 (cleaned up).

The court concludes that Defendants have met their burden to show that their conduct was objectively reasonable under then-existing law and that Defendants are entitled to qualified immunity and summary judgment on Count 4. For the reasons discussed above, Plaintiffs cannot prevail on their claims challenging the entry and search of the residence. Therefore, in the circumstances here, Defendants are entitled to qualified immunity as to their detention of both plaintiffs while officers carried out the search of the premises. *See Frego*, 690 F. App'x at 709 ("[G]iven that Defendants were entitled to qualified immunity as to the [warrantless] search [of absconded parolee's residence], they were also, in the circumstances of this case, entitled to qualified immunity as to the force they used to effectuate it." (citing *Muehler v. Mena*, 544 U.S. 93, 98–99 (2005))); *United States v. Williams*, No. 12-CR-6152G, 2015 WL 429087, at *18 (W.D.N.Y. Feb. 2, 2015) (warrantless search based on emergency aid doctrine), *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. May 29, 2015).

Defendants are also entitled to qualified immunity as to Mr. Foster's arrest after the discovery of the guns and ammunition in the basement. Mr. Foster's conditions of parole prohibited the possession of firearms or ammunition. The contraband was in a common area, but its location was close enough to Mr. Foster's residence that, under the circumstances, it was sufficient to warrant a reasonable belief that Mr. Foster was in violation of his parole conditions.

Mr. Foster argues that multiple other building residents had access to the basement space and that his room on the second floor was further away from the weapons than the other residences. (*See* Doc. 36 at 7–8; Doc. 40 at 7.) He points out that the contraband was hidden in heating ducts. And he relies on cases holding that a defendant's "mere presence" in an area where contraband is found "is not sufficient to established that he exercised such dominion and control as to establish constructive possession." *People v. Diallo*, 137 A.D.3d 1681, 1682, 27 N.Y.S.3d 778 (Fourth Dep't 2016); *see also, e.g.*, *United States v. Willis*, 14 F.4th 170, 181 (2d Cir. 2021) (same). The City Defendants concede that "some courts have held that constructive possession may not exist based upon residency alone if the contraband is found in a common area of the home and is not in plain view" but assert that "other courts have made no such distinction." (Doc. 39 at 3 (citing *Jackson v. Suffolk County*, 87 F. Supp. 3d 386, 406–08 (E.D.N.Y. 2015)).)

"'Constructive possession exists when a person has the power and intention to exercise dominion and control' over the contraband in question and may be shown by direct or circumstantial evidence." *Willis*, 14 F.4th at 181 (quoting *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998)). "Mere presence is insufficient. However, 'presence under a particular set of circumstances from which a reasonable jury could conclude that the defendant constructively possessed contraband' is sufficient." *Id.* (quoting *United States v. Facen*, 812 F.3d 280, 287

(2d Cir. 2016)). "For example, documents pertaining to a defendant found in the same location as narcotics, possession of a key to the location where drugs are found, or whether the drugs are in plain view, are factors relevant to constructive possession." *Id.*

The two cases that Mr. Foster cites regarding constructive possession do not support his position. The court in *Diallo* held that the evidence did not support a finding that the defendant—who was found lying on the ground with a gunshot wound—had constructive possession of a revolver that was on the ground five feet away from him. 137 A.D.3d at 1682, 27 N.Y.S.3d 778. *Diallo* supports the general proposition that mere proximity to contraband is insufficient to establish constructive possession. But *Diallo* did not involve discovery of contraband in a shared residence.

The court in *People v. Boyd* reasoned that constructive possession could be inferred where officers found drug paraphernalia together with documents bearing the defendant's name and also found a handgun hidden under a chair near the entrance to defendant's residence. 145 A.D.3d 1481, 1482, 43 N.Y.S.3d 641 (Fourth Dep't 2016). Insofar as Mr. Foster argues that *Boyd* is distinguishable, the court agrees on that point. The record does not indicate that officers found any of Mr. Foster's documents together with the contraband. But the absence of such documents does not resolve the constructive-possession issue.

Mr. Foster's remaining arguments regarding constructive possession are insufficient to defeat summary judgment on Count 4. He contends that the contraband was located further away from him than from the other residents. That fact, however, is inconclusive at best. Mr. Foster also argues that the contraband was not in plain view. The court agrees that the evidence in this case differs from a case in which drugs are found in a common area in plain view, "suggesting that the defendant is a trusted member of the narcotics operation." *Facen*, 812 F.3d

at 287 (citing *United States v. Soto*, 959 F.2d 1181, 1185 (2d Cir. 1992)).  But the circumstances presented to the officers searching Mr. Foster's residence also did not indicate that the contraband was unlikely to be his.  *Cf. States v. Ortiz*, 943 F. Supp. 2d 447, 458 (S.D.N.Y. 2013) (officers improperly threatened to arrest defendant's mother on a theory of constructive possession based on the discovery of a gun inside a pocket of a man's coat located in a closet that the defendant told the officers contained his possessions).

Ultimately, the court concludes that—although there might be some circumstances where contraband found in a shared space is insufficient to support a constructive possession theory against a co-tenant—the officers in this case had at least arguable probable cause to arrest Mr. Foster on that theory because he had access to the common basement space.  The fact that a handful of other people also had access to that space does not alter this conclusion.  *See, e.g.*, *Caraballo v. City of New York*, 526 F. App'x 129, 131 (2d Cir. 2013) (summary order) (officers had arguable probable cause to arrest two individuals who slept "in a small apartment in which police found drugs on more than one occasion, including at the time of arrest" and where the defendants found suspected drugs in a common area of the apartment); *Jackson*, 87 F. Supp. 3d at 406 (ruling on summary judgment that a police officer had arguable probable cause to arrest Julie Jackson based on the undisputed facts that officers discovered drugs in a jacket pocket in a common area of the house where Jackson lived with her husband and son and that Jackson's husband did not admit that the drugs were his).

## C.      Section 1983 Claim for Malicious Prosecution (Count 2)

Law enforcement officers are also entitled to qualified immunity on § 1983 malicious-prosecution claims where they had "either probable cause or 'arguable probable cause.'"  *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017) (quoting *Martinez v. Simonetti*, 202 F.3d

625, 634 (2d Cir. 2000)).  The court's conclusions above regarding Count 4 apply equally to the claim in Count 2.  Defendants are accordingly entitled to summary judgment on Count 2.

### D.    Racial Discrimination (Count 6)

The court previously granted Chief DeGal and Officer McPartland's motion to dismiss Count 6.  (Doc. 16 at 19.)  The court therefore analyzes Count 6 as against the City Defendants.

The City Defendants attack Count 6 on two grounds.  First, the City Defendants point to the court's prior ruling dismissing Count 6 insofar as it purports to be a § 1981 claim but without prejudice to a motion to amend to assert the claim under § 1983.  (Doc. 12 at 9.)  The City Defendants argue that Mr. Foster did not move to amend the complaint and that Count 6 should be dismissed under the "law of the case" doctrine.  (Doc. 29 at 10.)  Second, the City Defendants argue that they are entitled to summary judgment on Count 6 "because there is no evidence that Detective Jermain's purported 'identification' of Mr. Foster from the video was based [] solely on race."  (*Id.* at 10–11.)

Mr. Foster argues that the complaint's reference to § 1981 was a "scrivener's error" that "should be amended accordingly."  (Doc. 36 at 9.)  He further notes that the record lacks any affidavit from Detective Jermain that might "negate" Count 6.  (*Id.* at 8.)  And he relies on his own testimony that he did not see anyone in the video who looked like him, "[j]ust people of the same skin color."  (Doc. 37 at 63–64.)

The court concludes that it is unnecessary to analyze the issues regarding pleading and amendment because the City Defendants are entitled to summary judgment on Count 6.  As the court stated previously in this case: "If law enforcement takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred."  (Doc. 16 at 18 (cleaned up).)  But it is Mr. Foster's burden to

prove the requisite "discriminatory intent." *Brown v. City of Oneonta*, 221 F.3d 329, 338

(2d Cir. 2000). The court concludes there is insufficient evidence in this case to go to the trier of

fact on that element.

Here, the video depicts an early morning bar scene with many Black patrons. Upon

viewing the video, Detective Jermain remarked that one of the people in the video could be

"Tez"—a Black man. That remark, even in the presence of parole officers, does not appear to

rise to the level of a "step to initiate an investigation" of Mr. Foster. Even if it did, the evidence

does not support any discriminatory intent. The court infers that Detective Jermain considered

Mr. Foster's race as she attempted to identify the Black suspect(s) depicted in the video.

*See Dickerson v. BPP PCV Owners LLC*, No. 21-CV-9003, 2022 WL 4538281, at *5 (S.D.N.Y.

Sept. 28, 2022) ("Race is certainly a component of one's physical appearance, and a significant

one at that."). But the court finds insufficient evidence that race was the only characteristic or

circumstance that Detective Jermain considered. And, as in *Dickerson*, "there are no other facts

tending to suggest that racial *animus* was at play." *Id.* Because Mr. Foster cannot establish the

elements of his discrimination claim, the City Defendants have no obligation to produce

evidence to "negate" the claim.

### E.     Section 1985 Conspiracy Claim (Count 7)

The elements of a conspiracy claim under 42 U.S.C. § 1985(3) are:

> 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of the equal protection of the laws, or of equal privileges
> and immunities under the laws; and 3) an act in furtherance of the conspiracy;
> 4) whereby a person is either injured in his person or property or deprived of any
> right or privilege of a citizen of the United States.

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269

n.4 (2d Cir. 2006)). "The conspiracy must also be 'motivated by some racial or perhaps

otherwise class-based, invidious discriminatory animus.'" *Id.* (quoting *Cine SK8, Inc. v. Town of*

*Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)).  But § 1985(3) does not create any rights; "[i]t is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979).  Because Defendants are entitled to summary judgment on all the remaining § 1983 claims discussed above, there is no underlying violation of constitutional rights sufficient to support a § 1985 conspiracy claim.

## II.    New York Claims

In his response to Chief DeGal and Officer McPartland's August 2019 motion for partial dismissal, Mr. Foster conceded that his state-law claims against those defendants could be brought only in the New York Court of Claims and advised that "said common law claims have now been brought in the appropriate jurisdiction." (Doc. 10 at 1.)  The court accordingly dismissed those claims without prejudice. (*See* Doc. 12 at 9.)

In their summary judgment motion, the City Defendants request that the court retain supplemental jurisdiction and dismiss the remaining state-law claims on the merits. (Doc. 29 at 11–13.)  Mr. Foster also asks the court to exercise jurisdiction over the state-law claims based on his contention that the federal claims should survive summary judgment. (Doc. 36 at 9.)

There appears to be no dispute that the relevant elements of Mr. Foster's state-law claims for malicious prosecution, false arrest, and false imprisonment (Counts 3 and 5) are substantially the same as those discussed above for the parallel claims brought under § 1983.  Mr. Foster has supplied no basis for a different result on the state-law claims, and the court therefore elects to retain jurisdiction and grant summary judgment to the City Defendants on those claims.

Mr. Foster has also not responded to the City Defendants' arguments that his claim for intentional infliction of emotional distress (IIED) (Count 8) is time-barred and is unsustainable on the merits. (*See* Doc. 29 at 12–13.) The court finds that Mr. Foster has conceded the City Defendants' arguments regarding the IIED claim. *See, e.g.*, *White v. CSX Transp., Inc.*, No. 19-CV-500, 2023 WL 7166523, at *4 (W.D.N.Y. Oct. 31, 2023) (the court may infer from a counseled party's partial opposition to summary judgment that undefended claims are abandoned). In any case, the IIED claim fails on its merits because it is premised on conduct that "falls well within the ambit of other traditional tort liability"—namely, the unsuccessful claims discussed above. *Doe v. AR*, No. 21-CV-06353, 2022 WL 1624081, at *11 (W.D.N.Y. May 23, 2022) (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 159 (2d Cir. 2014)).

## III.    Crossclaims

The State Defendants assert that all of the City Defendants' crossclaims must fail. (Doc. 33-5 at 8.) The court agrees that, because all of Plaintiffs' claims against all defendants fail, there is no basis for the City Defendants to seek indemnification from the State Defendants.

### <u>Conclusion</u>

Defendants' Motions for Summary Judgment (Docs. 29, 33) are GRANTED.

Dated this 29th day of March, 2024.

Geoffrey W. Crawford, Judge
United States District Court